UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| JOHN A. BOENDER, III and | ) | |
| S.O. SIMONS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 10-30061-DPW |
| v. | ) | |
| | ) | |
| SCOTT G. HARDIN, MARK S. | ) | |
| POPADIC d/b/a THE APPRAISER | ) | |
| GUY, LAW OFFICE OF GOULD & | ) | |
| BURKE, PLLC, and WILKINSON | ) | |
| LAW OFFICES, P.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |


MEMORANDUM AND ORDER
July 19, 2012


John A. Boender III and S.O. Simons, Inc., filed this suit

against Scott G. Hardin, Mark S. Popadic (d/b/a The Appraiser

Guy), the Law Office of Gould & Burke, PLLC, and Wilkinson Law

Offices, P.C., claiming malpractice, negligence, negligent

misrepresentation, breach of contract, breach of implied covenant

of good faith and fair dealing, and violations of Massachusetts

General Laws chapter 93A in connection with a real estate

transaction.  Hardin and Wilkinson each filed a motion for

summary judgment.[1]  For the reasons below, I will grant both

---

[1]  The parties stipulated to dismiss with prejudice plaintiffs'
claims against Popadic and Gould & Burke.  Dkt. No. 73.  Thus,
the only remaining claims in the Complaint are for malpractice
against Wilkinson (Count II) and Hardin (Count III), negligent
misrepresentation against Hardin (Count VI), and a violation of
chapter 93A against Hardin (Count XI).

Hardin's (Dkt. No. 74) and Wilkinson's (Dkt. No. 79) motions for summary judgment.

## I.   BACKGROUND

<u>A.</u>   <u>Parties</u>

Plaintiffs Boender, a Maryland resident, and S.O. Simons, Inc., a Maryland corporation, jointly funded high-risk short-term loans made to low-credit individuals through Financial Resources Mortgage, Inc. ("FRM"), a New Hampshire mortgage broker not subject to this action.

Hardin is a certified real estate appraiser doing work for Popadic, the owner of The Appraiser Guy, a Massachusetts company doing real estate appraisals in New England.

Gould & Burke is the New Hampshire law firm that represented plaintiffs in a number of their loans made through FRM.  Gould & Burke hired Wilkinson, a Massachusetts law firm wholly owned by Sarah Wilkinson, a Massachusetts-licensed attorney, to perform the closing that gave rise to this lawsuit.

<u>B.</u>   <u>Facts</u>

   *1.   Boender, Simons, and FRM*

In 2006, Boender contacted FRM about obtaining a loan for his business.  During this interaction, Boender learned that FRM offered outside investors the opportunity to provide financing to people with poor credit in order to obtain a high rate of return

on the loaned capital.  Although Boender did not ultimately use FRM to fund his own business, he and a friend, Stephen Simons, decided to begin investing in FRM-brokered private financing arrangements.[2]

Prior to the transaction at issue here, Boender and Simons engaged in approximately four private financing transactions with high-risk borrowers through FRM.  In total, between 2007 and 2009, Boender invested in approximately fifteen such transactions, and Simons invested in nineteen.

2.   *Hardin Appraises Villeneuve's Property*

In fall 2007, T&M Mortgage Solutions---an unrelated mortgage company not part of the cast of characters involved in the transaction giving rise to this suit---was contemplating issuing a loan to Deborah Villeneuve, the owner of approximately 97 acres located at 38 Petersham Road in East Templeton, Massachusetts. In deciding whether to issue the loan, T&M hired Hardin to perform an appraisal.

On October 4, 2007, Hardin performed the appraisal, and estimated that Villeneuve's lot was worth $800,000.  T&M ultimately decided not to issue a loan to Villeneuve.

---

[2]  Simons invested through his company, S.O. Simons, Inc.

*3.   Plaintiffs Research Funding a Loan to Villeneuve*

In November 2007, one month after Hardin performed the appraisal for T&M and T&M decided not to make a loan to Villeneuve, Villeneuve approached FRM about obtaining a loan. FRM collected a package of information about Villeneuve, her husband, their company Vilco Construction, Inc., and the land she proposed to use as collateral.  The package included Villeneuve's loan application and background and credit history; tax returns for Villeneuve, her husband, and their company; and a copy of Hardin's appraisal of Villeneuve's 97 acres.

Neither of the plaintiffs paid any money for Hardin's appraisal, nor had they communicated with him in any way while he appraised Villeneuve's property.  Indeed, neither the plaintiffs nor Hardin had ever heard of the other in 2007.  While the plaintiffs received a copy of Hardin's appraisal through FRM, Hardin never gave his written consent that it could be distributed to them.[3]

_____

[3]  Paragraph 10 of the Statement of Limiting Conditions and Appraiser Certification in Hardin's appraisal stated:

> The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report . . . to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the

FRM approached plaintiffs with Villeneuve's loan application, and presented them with the information package. The proposed loan was for $335,000, secured by the 97 acre parcel in East Templeton, and FRM recommended that the terms of the loan be a 14% annual interest rate and a one-year balloon.

According to the information package provided by FRM to the plaintiffs, Villeneuve's income derived from draws from her construction company in the amount of $2,700 per month.  Her household's adjusted gross income in 2005 was $31,284, and in 2006 was $25,770.  Other than the property, Villeneuve's only asset was a boat.

The information package revealed that Villeneuve had significant debts at the time of her application.  Her credit report stated that she had a loan for the boat in the amount of $65,885, a car loan for $36,195, and credit card debt in the amount of $23,372.  All save $11,000 of the debt had been incurred in the few months prior to Villeneuve's application.

At the time of her loan application, Villeneuve's monthly minimum payments on her debt amounted to $1,823.  The loan she

United States or any state or the District of Columbia
. . . .  The appraiser's written consent and approval
must also be obtained before the appraisal can be
conveyed by anyone to the public through advertising,
public relations, news, sales, or other media.

requested from the plaintiffs proposed a monthly payment of $3,969, for a total of $5,792 in monthly minimum debt payments on $2,700 of monthly income.

4.  *Plaintiffs Provide Loan to Villeneuve*

Even though Villeneuve's monthly debt payments with the proposed loan would amount to more than double her entire household's monthly income, plaintiffs decided to make the loan, and retained the law firm of Gould & Burke to draw up the closing documents.  On November 19, 2007, Boender and Simons sent checks totaling $335,000 to Gould & Burke, along with a letter from Boender (dated May 2007) outlining conditions for providing the funds to Villeneuve.[4]  Two of the conditions in that letter are relevant here: one instructed Gould & Burke to obtain personal guarantees on the loan from Villeneuve and her husband, and the other instructed Gould & Burke to pay all "current" real estate taxes at the time of closing.  The loan servicer, CL&M, Inc., was to pay the future real estate taxes from funds that would be held in escrow.

On November 30, 2007, the plaintiffs authorized Gould & Burke to release the $335,000 to CL&M for the Villeneuve loan.

---

[4]  The conditions were part of a boilerplate letter Boender sent to Gould & Burke for all of the plaintiffs' private financing transactions.  There is no evidence in the record detailing whether the conditions had been fulfilled in prior transactions.

Those funds were held in escrow while an issue with the title to the 97 acres was resolved.

In February 2008, Gould & Burke hired Wilkinson to close the Villeneuve loan and clear title to the property, because Gould & Burke was not licensed in Massachusetts.  Gould & Burke drafted all of the loan documents and provided closing instructions to Wilkinson, listing the documents necessary to complete the Villeneuve loan.  That list was as follows:

1.   Commercial Construction Loan Agreement
2.   Addendum to Loan Agreement
3.   Promissory Note
4.   Mortgage, Security Agreement and Assignment of Rents and Leases
5.   Collateral Assignment of Rents and Leases
6.   Payment Letter/Draw Request
7.   Compliance Agreement
8.   Correction Agreement Limited Power of Attorney
9.   Request for Information - TIN
10.  Name/Signature Affidavit
11.  Affidavit of Encumbrance
12.  Borrower's Acknowledgement [sic]

The closing instructions did not request that Wilkinson obtain the Villeneuves' personal guarantees on the loan.  The May 2007 directives letter from the plaintiffs to Gould & Burke was not included or referenced in the documents sent to Wilkinson, and there is no evidence that the letter was ever sent to

Wilkinson or that Wilkinson was otherwise put on notice of its existence or terms.[5]

On February 20, 2008, Wilkinson closed the transaction with Villeneuve according to the closing instructions given by Gould & Burke.  At the time of closing, there were $160,000 in past taxes due on the property, which were paid out of the available funds.

On February 26, 2008, Gould & Burke notified plaintiffs that the transaction had closed, and attached the closing documents. Nothing in the closing documents said that personal guarantees had been obtained from the Villeneuves.  The closing documents also made clear that Wilkinson, not Gould & Burke, had performed the closing.

CL&M invited plaintiffs to contact it or Gould & Burke if they had any questions or concerns about the closing.  Simons responded on March 21, 2008, that he had "some concerns," but those concerned typographical corrections to the closing documents---the loan was in his name, but should have been in his company's name; his ownership with Boender was as tenants in the

---

[5]  An attorney from Gould & Burke said he would ordinarily check closing documents to make sure that the closing had complied with a client's instructions.  That attorney, however, could not remember whether or not he had done so in this instance.  Sara Wilkinson repeatedly stated at her deposition that no such instructions were ever communicated to her, and no written instructions with the personal guarantee requirement are in the record.

entirety, but should have been as tenants in common; the loan documents had the wrong contact information for him on them; and a mortgage assignment was missing from the packet of closing documents he had received.  Neither Simons nor Boender complained to CL&M or Gould & Burke that the closing documents did not include the Villeneuves' personal guarantees, or that Wilkinson, not Gould & Burke, had executed the closing documents.

    5.   *Villeneuve Defaults*

    CL&M made payments on the loan out of the funds held in escrow until October 8, 2008.  After October 8, Villeneuve failed to make any monthly payments.  On December 29, 2008, Gould & Burke alerted Villeneuve that she was behind on her payments for the months of November and December.

    6.   *The Aftermath*

    In January 2009, Villeneuve told Boender that the Fish and Wildlife Department had offered to purchase their 97 acre property for $280,000 based on an independent appraisal it had completed.  Plaintiffs grew concerned that Villeneuve could not repay the loan, and that the value of the property was less than the value of the Promissory Note, so they sought to sell the property.  With the agreement of Villeneuve, the plaintiffs arranged the sale of the 97 acres in spring 2011 for $190,000.

C.   Proceedings

On March 30, 2010, plaintiffs filed their complaint against the defendants.  On January 31, 2012, plaintiffs stipulated to dismiss with prejudice their claims against Popadic and Gould & Burke.  On March 2, 2012, Hardin and Wilkinson each filed separate motions for summary judgment.

## II.   STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

As I must, I "view the facts in the light most favorable to the party opposing summary judgment."  *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).

### III.  HARDIN'S MOTION FOR SUMMARY JUDGMENT

The basic question before me on Hardin's Motion for Summary Judgment may be stated concisely:  may a private lender recover economic losses from an appraiser, in the absence of privity of contract, under the theories of negligence or negligent misrepresentation?

Plaintiffs assert three causes of action against Hardin. Count III alleges that Hardin committed malpractice and was negligent in his appraisal of Villeneuve's property; Count VI alleges that Hardin made negligent misrepresentations to the Plaintiffs relative to the value of the property; and Count XI alleges that Hardin violated chapter 93A by engaging in unfair and deceptive practices.  I address each in turn below.

A.   Malpractice/Negligence

Plaintiffs' negligence claim against Hardin fails.  To prove a negligence claim, a plaintiff must show that a defendant owed him a duty, breached that duty, and that the defendant's breach was the but-for and proximate causation of some resulting harm to the plaintiff.  *Brown* v. *United States*, 557 F.3d 1, 3-4 (1st Cir. 2009).  Whether a defendant owed a plaintiff a duty of care is a legal question amenable to summary judgment.  *Id.* at 4.

Under the so-called "economic loss" rule, when a party seeks to recover pecuniary or economic loss, as the plaintiffs do here,

11

the party must have had a contractual relationship with the defendant.  *See Aldrich* v. *ADD Inc.*, 770 N.E.2d 447, 454 (Mass. 2002) ("It has been a long-standing rule in this Commonwealth, in accordance with the majority of jurisdictions that have considered this issue, that 'purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.'" (citation omitted)).[6]

Here, there was no contractual relationship between Hardin and the plaintiffs, thus plaintiffs' negligence claim seeking economic loss due to Hardin's negligent appraisal fails. Hardin's contract for the appraisal of Villeneuve's land was with T&M Mortgage Solutions, not the plaintiffs.  The appraisal was conducted for T&M, who was identified on the appraisal as the "Lender/Client."  Plaintiffs admitted that they have never had a connection to T&M or to Hardin.  Indeed, at the time that Hardin completed his appraisal, he had never heard of either of the plaintiffs, FRM, or any of the parties involved in the transaction at hand except for Villeneuve, whose land Hardin was appraising.  Thus, because no contract existed between Hardin and

---

[6]  As noted below in Section III.B., there is an exception to the economic loss rule for losses stemming from negligent misrepresentation.  *Nota Constr. Corp.* v. *Keyes Assocs., Inc.*, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998).

the plaintiffs, the plaintiffs cannot recover their economic loss through tort law on pure negligence grounds.

Furthermore, Hardin argues that his relationship with the plaintiffs is too attenuated for him to have owed them a duty of care.  Hardin undisputably owed a duty to T&M as the Lender/Client.  *See* APPRAISAL STANDARDS BOARD, UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE 2 (2006) ("The client identified by the appraiser in an appraisal . . . is the party or parties with whom the appraiser has an appraiser-client relationship in the related assignment . . . ."). However, Hardin points to the Appraisal Standards Board's Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users*,[7] which notes that an "appraiser's obligation to intended users other than the client is limited to addressing their requirements as identified by the appraiser at the time the appraiser accepts the assignment."

Plaintiffs argue that they are in the same position as a prospective lender using T&M as a broker, and therefore it is a jury question whether it was foreseeable to Hardin that a party

---

[7] The Appraisal Standards Board issues Statements on Appraisal Standards "for the purposes of clarification, interpretation, explanation, or elaboration of the Uniform Standards of Professional Appraisal Practice (USPAP).  Statements have the full weight of a Standards Rule . . . ."  APPRAISAL STANDARDS BOARD, UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE 80 (2006).

13

other than T&M would rely on his appraisal.  Plaintiffs note Hardin's statement during his deposition that ordinarily when he was commissioned by brokers, he expected that his work would be reviewed by lenders, and contend that this raises a triable issue of fact whether plaintiffs were reasonably foreseeable users of Hardin's appraisal.  However, plaintiffs omit the very next question of Hardin's deposition:

> Q.   And it was your understanding with T&M Mortgage
>      Solutions that they would be free to share your
>      appraisal with prospective lenders in this subject
>      property, correct?
> A.   No.

This is because, as noted above, paragraph 10 of the appraisal restricted the audience for Hardin's appraisal:

> The appraiser [Hardin] must provide his or her prior
> written consent before the lender/client [T&M]
> specified in the appraisal report can distribute the
> appraisal report . . . to anyone other than the
> borrower; the mortgagee or its successors and assigns;
> the mortgage insurer; consultants; professional
> appraisal organizations' any state or federally
> approved financial institution; or any department,
> agency, or instrumentality of the United States or any
> state or the District of Columbia; except that the
> lender/client may distribute the property description
> section of the report only to data collection or
> reporting service(s) without having to obtain the
> appraiser's prior written consent.  The appraiser's
> written consent and approval must also be obtained
> before the appraisal can be conveyed <u>by anyone to the
> public</u> through advertising, public relations, news,
> sales, or <u>other media</u>.

(emphasis added).   There is no evidence that Hardin gave T&M or
Villeneuve (the only two parties with copies of his appraisal)
his written consent to disclose the appraisal to FRM.

Thus, based both on the economic loss doctrine and on
plaintiffs' inability to establish Hardin owed them a duty of
care, their negligence claim fails, and summary judgment is
warranted for Hardin on that count.

B.   Negligent Misrepresentations

Although a pure negligence claim fails under the economic
loss doctrine when it seeks recovery of pecuniary losses in the
absence of a contractual relationship, courts have held that the
tort of negligent misrepresentation may be used to recover
economic losses by analogy to Restatement (Second) of Torts §
522.[8]  *See, e.g.*, *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 688 N.E.2d

---

[8]  That section, titled "Information Negligent Supplied for the
Guidance of Others," provides that:

(1) One who, in the course of his business, profession
or employment, or in any other transaction in which he
has a pecuniary interest, supplies false information
for the guidance of others in their business
transactions, is subject to liability for pecuniary
loss caused to them by their justifiable reliance upon
the information, if he fails to exercise reasonable
care or competence in obtaining or communicating the
information.

(2) Except as stated in Subsection (3), the liability
stated in Subsection (1) is limited to loss suffered

    (a) By the person or one of a limited group of

1368, 1371-72 (Mass. 1998) (adopting the test from § 552 for claim of negligent misrepresentation brought against professional accountants).  The Restatement notes that for liability to arise on the basis of information supplied for the guidance of others, there must be (1) justifiable reliance upon the information by a limited group of persons, (2) for whose benefit and guidance the appraiser (a) intends to supply the information, or (b) knows that the recipient intends to supply it.  Restatement (Second) of Torts § 522.[9]

---

       persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

       (b) Through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

    (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 522.

[9]  The comments to the Restatement explain the bounds of the limitation.  On the one hand, it is sufficient "insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given."  On the other hand, "[i]t is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated."  Restatement (Second)

The Massachusetts Supreme Judicial Court has held in the accounting context that an accountant's liability to noncontractual third parties is limited to those third parties who can demonstrate "actual knowledge on the part of accountants of the limited-though unnamed-group of potential [third parties] that will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence." *Nycal Corp.*, 688 N.E.2d at 1372 (quotation and citation omitted, edits in original).  The accountant's "actual knowledge" should be "measured 'at the moment the audit [report] is published, not by the foreseeable path of harm envisioned by [litigants] years following an unfortunate business decision.'" *Id.* at 1372-73 (citation omitted, edits in original).

In *Nycal*, KPMG had been retained to audit Gulf Resources & Chemical Corporation's 1990 financial statements.  *Id.* at 1369.  At the time that KPMG was auditing Gulf's financial statements, Gulf's board of directors was fighting a hostile takeover threat presented by D.S. Kennedy & Co., and was also discussing a possible sale to Aviva Petroleum, Inc.  *Id.*  KPMG completed its audit report, which was included in Gulf's 1990 annual report made publicly available on February 22, 1991.  *Id.*  One month

of Torts § 522 cmt. h.

later, Nycal entered into discussions with Gulf about purchasing a large block of Gulf shares, during which Gulf provided Nycal with a copy of its 1990 annual report, including KPMG's audit report.  *Id.* at 1370.  Nycal, in reliance on KPMG's audit report, entered into a stock purchase agreement with Gulf in 1991.  Gulf, however, later went into bankruptcy, rendering Nycal's investment worthless.  *Id.* at 1369.  Nycal sued KPMG, alleging negligent misrepresentations in the 1990 annual report it prepared.  *Id.* The trial court granted summary judgment for KPMG under section 552 of the Restatement (Second) of Torts.  *Id.*

The Massachusetts Supreme Judicial Court, taking the matter up on direct appellate review, held that the lower court

> correctly concluded under § 552, that the undisputed
> facts failed to show that the defendant knew (or
> intended) that the plaintiff, or any limited group of
> which the plaintiff was a member, would rely on the
> audit report in connection with an investment in Gulf.
> To the contrary, the record suggests that the defendant
> did not prepare the audit report for the plaintiff's
> benefit and that the plaintiff was not a member of any
> "limited group of persons" for whose benefit the report
> was prepared.  At the time the audit was being
> prepared, the plaintiff was an unknown, unidentified
> potential future investor in Gulf. The defendant was
> not aware of the existence of the transaction between
> the plaintiff and Gulf until after the stock purchase
> agreement had been signed and only a few days before
> the sale was completed.

*Id.* at 1373.  Consequently, the Supreme Judicial Court upheld the grant of summary judgment for KPMG.  *Id.* at 1374.

Here, as with KPMG in *Nycal*, it is undisputed that Hardin did not know the plaintiffs and had no contact with them at the time he performed his appraisal on October 4, 2007.  Similarly, Hardin was unaware of any private financing arrangement, or real estate transaction, planned between the plaintiffs and Villeneuve at that time, as he was only dealing with T&M for an independent, unconsummated transaction with Villeneuve.  Further, Hardin did not give his written consent that the appraisal be disclosed by FRM on a public website, or to the unknown plaintiffs, in contravention of paragraph 10 of the appraisal document. Therefore, Hardin argues, the plaintiffs cannot show that he had "actual knowledge . . . of the limited-though unnamed-group of potential" lenders that would rely on his appraisal, "as well as actual knowledge of the particular financial transaction that such information is designed to influence," because he did not know of the plaintiffs, nor did he have actual knowledge of their future, as-yet-uncontemplated private financing transaction.

Plaintiffs, on the other hand, suggest that they stood in the same position as T&M did, because both were parties with an interest in loaning money to the Villeneuve using the property as collateral.  Therefore, plaintiffs contend, they are within the limited class of people Hardin knew would rely on his appraisal

19

(namely, potential creditors to the Villeneuves), because their reasons for using the appraisal were the same as T&M's reasons.

Under the approach described in the Restatement, upon which the body of Massachusetts negligent misrepresentation law is founded, plaintiffs' argument fails. As comment h to section 552 makes clear, it is insufficient that the appraiser "merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated." Restatement (Second) of Torts § 552 cmt. h. Hardin's appraisal demonstrates that Hardin contemplated that T&M would use it, because T&M is listed as the "Lender/Client" on the cover. Hardin's appraisal further makes clear that Hardin intended to limit the scope of who could rely on the appraisal based on who could have access to it, as limited by paragraph 10 of the appraisal report. Hardin, much like KPMG, performed the appraisal not for the transaction contemplated by the plaintiffs (which was unknown and, indeed, uncontemplated at the time), but for a distinct transaction by an unrelated party.

Finally, plaintiffs' argument fails on policy grounds. If plaintiffs are correct, then an appraiser would open himself to unbounded liability projecting forward to all future lenders from the moment the appraiser submits his report to a single lender interested in using the appraised property as collateral for a

20

transaction.  The logic of the plaintiffs' position is that they are similarly situated to T&M as potential lenders involved in a transaction using the appraised 97 acre lot as collateral.  If, without a contractual relationship, the plaintiffs may sue on the basis they propose, there are no limiting principles which would prevent future lenders, even years down the line, from suing Hardin if they obtained a copy of his appraisal report and relied on it, no matter how old it was.  This would violate the spirit of § 552, as expressed in comment h.

In light of *Nycal*, the Restatement, the plaintiffs' inability to cite any illustrative case in their favor, and Hardin's clear attempts in the appraisal to limit the group of people who could rely on it, I cannot say that two plaintiffs who never contacted Hardin during the relevant time period, and for whom the appraisal was not made, can be said to be part of the "limited group of people" who can rely on Hardin's appraisal.  Thus, plaintiffs' negligent misrepresentation claim fails.

C.   <u>Chapter 93A</u>

Finally, plaintiffs' chapter 93A claim against Hardin cannot withstand summary judgment.  For a claim under chapter 93A § 11, "the conduct complained of must occur in a context in which the *parties to the transaction are persons engaged in 'trade or commerce' with each other* and therefore 'acting in a business

21

context.'" *Stop & Shop Supermarket Co.* v. *Loomer*, 837 N.E.2d 712, 718 (Mass. App. Ct. 2005) (emphasis added).

Here, there is no evidence that the plaintiffs and Hardin were engaged in a transaction amounting to "trade or commerce," and therefore the chapter 93A claim fails.  Plaintiffs admit they did not interact with Hardin at all during the relevant time period before 2009.  They did not contact Hardin to request an appraisal of the property, enter into a contract with him, or agree with him concerning the appraisal.  Nor did they pay him for his appraisal.  Thus, plaintiffs and Hardin did not engage in "trade or commerce" for purposes of chapter 93A § 11, and their claim fails.

## IV.  WILKINSON'S MOTION FOR SUMMARY JUDGMENT

The question I must address on Wilkinson's Motion for Summary Judgment is whether, when a law firm subcontracts out the closing of a real estate transaction to local counsel licensed in the proper jurisdiction, the client of the law firm may sue the local counsel for failure to comply with a condition not disclosed by the law firm to the local counsel.

Plaintiffs assert one cause of action against Wilkinson, alleging in Count II that Wilkinson committed malpractice by failing to (1) obtain personal guarantees from the Villeneuves; (2) alert the plaintiffs that there were substantial back taxes

22

owed on the property at closing; and (3) establish an escrow
account with the proceeds of the loan, from which FRM would pay
future real estate taxes.  Wilkinson moved for summary judgment
on Count II.  In their opposition, plaintiffs only defend their
claim that Wilkinson committed malpractice by failing to obtain
personal guarantees on the loan, consequently I consider
Wilkinson's motion unopposed on their remaining two theories.

In Massachusetts, for a client to succeed against an
attorney on a claim of malpractice, he "'must demonstrate that
the attorney failed to exercise reasonable care and skill in
handling the matter for which the attorney was retained; that the
client has incurred a loss; and that the attorney's negligence is
the proximate cause of the loss . . . .'" *Coastal Orthopaedic
Institute, P.C.* v. *Bongiorno*, 807 N.E.2d 187, 190 (Mass. App. Ct.
2004) (citation omitted).  Where, as here, the alleged negligence
is a failure to act in some regard, there can be no negligence
absent proof that the attorney had a duty to act.  The duty to
act, in turn, arises from the scope of the attorney-client
relationship.  *See Brown* v. *Gerstein*, 460 N.E.2d 1043, 1048-49
(Mass. App. Ct. 1984).  I therefore look to the scope of the
attorney-client relationship between Wilkinson and the plaintiffs
to determine whether, as plaintiffs contend, Wilkinson's failure
to act amounts to malpractice.

Wilkinson contends it was hired to serve as local counsel for the limited purpose of clearing title to the property and closing the Villeneuve transaction.  That has not been rebutted or countered in any way by the plaintiffs.  It is also undisputed that Gould & Burke was responsible for drafting all of the closing documents, and that Gould & Burke provided Wilkinson with those documents and a set of closing instructions to follow to close the deal.  As noted above, neither the closing instructions nor the closing documents said anything about the plaintiffs' requirement that personal guarantees be obtained from the Villeneuves' before closing, and there is no evidence in the record that Wilkinson received notice from Gould & Burke outside of the closing documents and closing instructions about the personal guarantees condition.

The undisputed evidence indicates that the scope of the attorney-client relationship between Wilkinson and the plaintiffs was limited to closing the deal on the documents and terms provided by Gould & Burke.  There is no evidence in the record that at the time of the closing, any party understood the engagement to be broader in scope than that.  Because the scope of the representation was limited, so too is the scope of the duty Wilkinson had to the plaintiffs.  That duty, in this case, was limited to clearing title to the property and closing the

24

Villeneuve transaction in accordance with Gould & Burke's
instructions with a reasonable degree of skill and care.

The Eighth Circuit has noted in the litigation context that
the limited engagement of local counsel does not expand that
counsel's duties beyond the scope of the work local counsel was
hired to perform.  "Local counsel does not automatically incur a
duty of care with regard to the entire litigation.  When the
client vests lead counsel with primary responsibility for the
litigation, the duty of local counsel is limited." *Macawber
Eng'g, Inc*. v. *Robson & Miller*, 47 F.3d 253, 257 (8th Cir. 1995)
(citing *Ortiz* v. *Barrett*, 278 S.E.2d 833, 838 (Va. 1981) (finding
that local counsel's duty was limited to the work assigned to him
by lead counsel)).  This approach is grounded in sound public
policy:

> Were the law otherwise, the costs involved in retaining
> local counsel would increase substantially.  Confronted
> with a duty to monitor lead counsel's handling of the
> litigation, local counsel would be bound to review all
> manner of litigation documents and ensure compliance
> with all deadlines.[10]  Out-of-state litigants would be

---

[10]  Footnote 5, located at this point in the Eighth Circuit's
opinion, stated:

> This duty would be burdensome.  To effectively monitor
> lead counsel's handling of the litigation, local
> counsel would have to insist on receiving service of
> all litigation documents, review the documents, and
> monitor lead counsel's progress toward meeting
> deadlines.  Simply checking with the court on a regular
> basis would not be enough.  Discovery documents are not

> forced to pay a local attorney to review lead counsel's
> work.  Given the skyrocketing costs of litigation, the
> duplication of effort and increased fees that would
> result from such a rule foster problematic public
> policy.  Though some litigants may choose to enter a
> representation agreement which includes extensive
> duties for local counsel, Minnesota law does not (and
> should not) require them to do so.

*Id.* at 257-58.

Here, Wilkinson was retained to close the Villeneuve

transaction in accordance with Gould & Burke's closing

instructions and to clear the title on the property.  There is no

dispute that Wilkinson did so.  Plaintiffs do not allege that

Wilkinson performed these two tasks with less than the degree of

care and skill of a reasonable attorney.  That is the entirety of

the duty that was required of Wilkinson under the circumstances.

The plaintiffs' claim therefore fails.

Furthermore, even if plaintiffs could establish that

Wilkinson did owe the plaintiffs a duty of care, they could not

show that her breach caused them harm.  The parties agree that to

--------

> routinely filed with the court, so local counsel would
> not learn of a failure to respond to request for
> admissions (as occurred in this case).  Likewise, it
> would not be sufficient to check with lead counsel.
> Such an inquiry will usually result in a reply from
> lead counsel that everything is under control (as it
> did in this case).  Lead counsel is not likely to
> disclose that it has been negligent.

*Macawber Eng'g, Inc.* v. *Robson & Miller*, 47 F.3d 253, 257 n.5
(8th Cir. 1995).

show harm in a case involving the loss of a monetary benefit as a result of an attorney's negligence, the plaintiff must show that the benefit was collectable. *See, e.g., Shimer* v. *Foley, Hoag & Eliot LLP*, 795 N.E.2d 599, 602-03 (Mass. App. Ct. 2003). Plaintiffs claim that there is a factual issue whether plaintiffs could have improved their position had personal guarantees been obtained by Wilkinson.  The argument is wholly speculative.

If Wilkinson had secured personal guarantees from Villeneuve and her husband, there is no reason to believe they would be better off.  As noted above, Villeneuve's only source of income was her construction company, which paid her roughly $2,700 per month.  Her household's adjusted gross income in 2005 was $31,284, and in 2006 was $25,770.  While her construction company had grossed $707,637 in 2005, by 2006 that number was cut by more than half, to $339,375.  There is no evidence that the company could have leveraged to provide greater income or alternative assets for recovery.  Other than the property and the construction company, Villeneuve's only asset was a boat, which itself was later reclaimed.

Villeneuve's outstanding debt at the time of the proposed transaction was extraordinary in comparison to her monthly income.  She had a loan for the boat in the amount of $65,885, a car loan for $36,195, and credit card debt in the amount of

27

$23,372.  This debt amounted to month minimum payments of $1,823.
The loan she requested from the plaintiffs proposed a monthly
payment of $3,969.  Combined with her other outstanding debt,
Villeneuve's total monthly debt payments after the plaintiffs
engaged in the transaction with her amounted to more than double
her household's monthly income, a fact disclosed to the
plaintiffs before they decided to make the loan.

Even if 2007 had not been the beginning of the worst
economic downturn this country faced since the Great Depression,
it is wholly implausible that Villeneuve would have been able to
afford the $5,792 monthly debt payments.  Because she was already
obligated on the full amount of the Promissory Note, personal
guarantees as to Villeneuve would be meaningless.

As to her husband, it is undisputed that he did not have any
assets at the time of his death in 2010.  There was deposition
testimony that Mr. Villeneuve originally owned the 97 acres of
land, but transferred it to his wife out of concern that his
personal creditors would try to take it.  The record, after the
close of all fact discovery, is devoid of any evidence of his
having property or assets that would have been collectable by the
plaintiffs had personal guarantees by Mr. Villeneuve been secured
by Wilkinson.

28

Plaintiffs have failed to prove that Wilkinson breached a duty that was owed to the plaintiffs, or that they were harmed even if there was such a breach.  Therefore, their claim for malpractice fails.

### V.   CONCLUSION

For the reason set forth above, I (1) GRANT Hardin's motion for summary judgment (Dkt. No. 74), and (2) GRANT Wilkinson's motion (Dkt. No. 79).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE